CONSIDER PARISH et al., Respondents, *v.* NEW YORK PRODUCE EXCHANGE et al., Appellants.

1. NEW YORK PRODUCE EXCHANGE — REASONABLE AMENDMENT OF BY-LAWS. Where a gratuity fund for the benefit of the widows and families of the deceased members of the New York Produce Exchange, a corporation organized for strictly commercial purposes, has been created under and by authority of an amendment to its charter providing therefor, and for the enactment of by-laws to carry it into effect and providing that they should be operative only on such of the then existing members of the exchange as should agree and consent thereto, the rights and obligations in reference to the fund of an existing member, who "agrees with the said exchange and with the other subscribing members that upon the death of each and every subscribing and future member of said exchange I will pay the assessment as provided in the by-laws," do

not rest upon his contract alone, but upon the contract as interpreted by the charter and the by-laws under which it was made, and the corporation has power to alter the by-laws by any reasonable amendment, which means one that does not impair his vested rights thereunder.

2. BY-LAW DIVERTING FUND FROM PURPOSE SPECIFIED IN CHARTER UNREASONABLE AND VOID. Where the gratuity fund has, by assessments upon members and other appropriation of moneys during a series of years, been accumulated for the benefit of the beneficiaries designated in the charter, a subsequent amendment of the by-laws which, among other things, provides that the fund may be converted into cash and after paying all expenses be distributed among the living subscribing members, is an attempt to devote it to an entirely different use and is unreasonable and void, not only because it destroys the rights of the members secured to them by the by-laws upon which they relied when they entered into the contract, but because it is a diversion of the fund to a purpose unauthorized by the charter.

*Parish* v. *N. Y. Produce Exchange*, 60 App. Div. 11, affirmed.

(Argued October 22, 1901; decided December 10, 1901.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the first judicial department entered April 17, 1901, affirming a judgment in favor of plaintiffs entered upon the report of a referee.

The nature of the action and the facts, so far as material, are stated in the opinion.

*Abel E. Blackmar* for appellants. The gratuity system exists in the charter and by-laws of the exchange and not in a contract between the members outside the corporate relation. (*Hellenberg* v. *Dist. No. 1, I. O. of B. B.*, 94 N. Y. 580; *Kemp* v. *N. Y. Produce Exch.*, 34 App. Div. 175; *McCord* v. *McCord*, 40 App. Div. 275; *People ex rel.* v. *L. & R. Assn.*, 150 N. Y. 94.) The gratuity by-laws are subject to amendment in matters of substance. (*Fugure* v. *M. Society of S. J.*, 46 Vt. 362; *Pain* v. *Société S. J. B.*, 172 Mass. 319; *Supreme Commandery* v. *Ainsworth*, 71 Ala. 436; *Poultney* v. *Bachman*, 31 Hun, 49; *MacDowell* v. *Ackley*, 93 Penn. St. 277; *Bowie* v. *Grand Lodge*, 99 Cal. 392; *Supreme Lodge K. of P.* v. *Knight*, 117 Ind. 489; *Fullenwider* v. *Royal League*, 180 Ill. 621; *McCabe*

v. *F. M. T. A. B. Society*, 24 Hun, 149; *Hutchinson* v. *Supreme Tent K. of M.*, 68 Hun, 355.) The members of the exchange have no vested interest in the gratuity system which has been violated by the amendment in question. (Grant on Corp. 91; Boisot on By-laws, 14, § 19; *Stohr* v. *Musical Fund Soc.*, 82 Cal. 557; *Engelhardt* v. *F. W. P. D. S. & L. Assn.*, 148 N. Y. 281.) The amendment in question was reasonable. (1 Thomp. on Corp. § 1022; Dillon on Mun. Corp. § 327; *Supreme Lodge K. of P.* v. *Knight*, 117 Ind. 497.) The provision in the amendment for the distribution of the surplus fund does not violate the spirit or letter of the charter. (*Durlan* v. *Central Verein*, 7 Daly, 168; *Sabin* v. *Phinney*, 134 N. Y. 423; *M. M. B. Society* v. *Burkhart*, 110 Ind. 189; *Hellenberg* v. *District No. 1, I. O. of B. B.*, 94 N. Y. 580; *Marsh* v. *Supreme Council*, 149 Mass. 512; *Supreme Council* v. *Morrison*, 16 R. I. 468; *Carpenter* v. *Knapp*, 101 Iowa, 712.) The provision for the purchase and retirement of membership certificates is severable from the other provisions and may be separately upheld. (*Amesbury* v. *B. M. F. Ins. Co.*, 6 Gray, 607; 2 Kyd on Corp. 155.)

*Charles F. Brown, Charles H. Brush* and *John J. Crawford* for respondents. The gratuity system exists by force of a contract between the original members of the exchange who subscribed thereto and those who have become members of the exchange since the adoption of the system. (L. 1882, ch. 36.) The agreement so made and existing cannot be altered or changed except by consent of all the contracting parties. If, however, the gratuity system exists solely in the charter and by-laws of the corporation, and not in contract, as the appellants contend, the amendment in question is void on the ground that it was unreasonable, in that it destroyed vested rights and was beyond the power of the corporation. (*Kent* v. *Q. M. Co.*, 78 N. Y. 159; *Weiler* v. *E. A. Union*, 92 Hun, 277; *Engelhardt* v. *F. W. P. D. S. & L. Assn.*, 148 N. Y. 281.) The assumption of power to pass the amendment in

question involves and rests upon the right to discontinue the gratuity system altogether. (*McDonald* v. *Ross-Lewin*, 29 Hun, 87; *Matter of G. B. Assn.*, 63 Hun, 263; *Smith* v. *Brown*, 75 Hun, 231; *Gray* v. *Haviland*, 42 App. Div. 626.) The direction to the trustees of the gratuity fund, to convert the present accumulated fund into cash, and, after paying therefrom all expenses, to distribute the same among the subscribing members as the class should be constituted on February 1, 1900, violates the contract in relation to the gratuity system, and is void. (Perry on Trusts [5th ed.], § 104; *Meiggs* v. *Meiggs*, 15 Hun, 457; *Watts* v. *Shipman*, 21 Hun, 598.)

PARKER, Ch. J. The defendant corporation came into existence under the name of the New York Commercial Association. Its purposes were declared by the act of incorporation to be:

" To provide and regulate a suitable room or rooms for a produce exchange in the city of New York, to inculcate just and equitable principles in trade, to establish and maintain uniformity in commercial usages, to acquire, preserve and disseminate valuable business information, and to adjust controversies and misunderstandings between persons engaged in business." (Section 3 of chapter 359, Laws of 1862.)

The name was subsequently changed to that of the New York Produce Exchange, but it continued to be purely a commercial body, making no attempt to enlarge its field of operations beyond that specifically authorized by the act creating it. In the year 1881, however, certain members of the exchange urged that the association should have a life-insurance feature by which, on the death of a member of the association, his widow or next of kin should receive a sum of money as the result of an assessment upon the other members. A committee was appointed to take the matter into consideration and to report their recommendations. The committee, which consisted of seven members, reported some months later, and on the ninth day of January, 1882, recommending what

it termed a "system of gratuity," optional as to existing, but compulsory as to future members, and, as their plan could only be made effective by an act of the legislature and the amendment of the by-laws of the corporation so as to harmonize therewith, the committee recommended amendments to by-laws numbered 3, 35 and 42, and the substitution of a new by-law numbered 57 for the existing by-law of that number which was to become number 58.

Steps were at once taken to submit the recommendations of the committee to the members of the exchange which resulted in their approval by a large majority of the members, and in March of that year the legislature (by chapter 36 of the Laws of 1882) enlarged the purposes of the corporation by providing that in addition to those expressed in the original act it might also "make provision for the widows and families of deceased members." In reference to the latter purpose section 3 of the act provided as follows:

"Such present members of said corporation, as shall agree thereto, and all persons who shall hereafter join said corporation, may be assessed such sum as shall be provided in the by-laws of said corporation, upon the death of any such member agreeing thereto, or who shall hereafter join said corporation; which sum, or such proportion thereof as the by-laws may provide, and such proportion of the surplus income of said corporation as the by-laws may provide may be paid to the widow, children, next of kin of, or other persons dependent upon said deceased member, in such manner as the said by-laws shall prescribe. But no such assessment shall be made upon, and no such payment shall affect the proportionate share in the property of said corporation, of any present member not consenting thereto."

The exchange and its members, pursuant to the authority thus conferred, at once created and put into effect a gratuity system. Briefly, it may be said that the plan contemplated payment, out of assessments collected, to the widow and children of a deceased member the sum of $2,000 or such proportionate part thereof as the subscribing memberships at

the time of such death should bear to the full number of memberships of the exchange. In case of death during the second year $3,000 or the proportionate part, the amount of payment increasing by $1,000 for each year after the adoption of the by-law until the maximum amount of $10,000 or said proportionate part should be reached. The gratuity was, in the main, to be paid by an assessment upon such existing members of the exchange as should assent to the plan and agree to be bound by it and by all future members of the exchange. The act of the legislature authorizing the exchange to adopt the insurance feature did not attempt to impose the gratuity system upon the existing members of the exchange, but instead so far as they were concerned the act was permissive and only to be put in force against any of them by their separate and express consent, but upon those who might afterward become members of the exchange the corporation was authorized to impose the gratuity system. The steps taken to accomplish this result, so far as the exchange as a corporate body was concerned, consisted of amendments to the by-laws in accordance with the recommendations of the special committee.

The new by-law added (number 57) provided in substance (1) that upon the death of any subscribing member there should be assessed against each subscribing membership the sum of $3, which should thereupon become due to the exchange and a lien on said membership; (2) the amount to be paid out of the money collected by such assessment, which amount was based upon the period intervening between the adoption of the by-law and the death of the member, the smallest amount being $2,000, and the largest $10,000; (3) for the division or distribution of the money collected among the members of the family of the deceased member, and designated the beneficiary in case a member should die without leaving either widow or children; (4) for the creation of a board of trustees to be known as the trustees of the gratuity fund, who were charged with the management and distribution of the fund and the execution of the provisions of the

by-law; (5) for the payment of death claims out of the gratuity fund when the number of deaths should exceed fifty in any one year, but further providing that should the gratuity fund be exhausted the liability of each membership to make payments on account of assessments in excess of $150 in any one year should not be impaired; (6) that after the exchange should be free from debt a proportionate part of the surplus income of the exchange intended for exchange purposes should be paid annually to the gratuity fund; (7) for the exemption of the exchange as a corporate body from all liability by reason of the gratuity system, except for the payment of such assessments or such part thereof as should be collected from the members; (8) that the gratuity system should not be considered as creating an estate *in esse* which could be mortgaged or pledged. The amendment to by-law 21 provided that the same penalties for failure to pay an assessment for gratuity purposes should be enforced against the certificate of membership as were theretofore provided to pay assessments for the purpose of paying the expenses of the exchange by which the sale of a membership was authorized for the purpose of enforcing the collection of an assessment.

Within sixty days nearly twenty-five hundred members of the exchange subscribed to the gratuity system, the form of subscription being as follows:

"In consideration of the benefits to be derived therefrom, and of the like agreement of other members of the New York Produce Exchange, I, the undersigned, a member of the New York Produce Exchange, hereby agree with the said exchange, and with the other subscribing members, that upon the death of each and every subscribing and future member of the said exchange, I will pay the assessment as provided in the by-laws, and that the sum so assessed as my proportionate share in the surplus income of the exchange shall be paid to the family of, or others dependent upon such deceased members, as provided in the charter and by-laws of said exchange.

"Upon request I will present my present certificate of mem-

bership to be exchanged for a participating certificate in the form to be issued by said exchange."

Since that time, by subscription and by admission of new members on transfer of certificates, two thousand nine hundred and forty-seven of the memberships have come under the gratuity system, leaving at the time of the commencement of this action but fifty-three non-subscribing memberships. All persons admitted to membership in the exchange since the adoption of the system have subscribed to the following :

" In consideration of the benefits to be derived therefrom, and of the agreement of other members of the New York Produce Exchange, I, the undersigned, a member of the New York Produce Exchange, hereby subscribe to the gratuity fund, and agree with the said exchange and with the other subscribing members, that upon the death of each and every subscribing and future member of the said exchange, I will pay the assessment, as provided in the by-laws, and that the sum of money prescribed by the by-laws of the said exchange shall be paid to the beneficiaries of such member after his death, and to my beneficiaries in the event of my death while a member of said exchange."

A certificate of membership was issued to each subscribing member in the following form :

" This certifies that John Doe is a member of the New York Produce Exchange at the time of the date hereof, and has subscribed to the plan for providing for the families of members. This certificate, and the interests which it represents, are subject to sale for unpaid assessments, as provided in the by-laws, and may be transferred on the books of the exchange to a person eligible to membership only on the surrender of this certificate, duly assigned in writing, provided all assessments are paid and the by-laws and rules are fully complied with."

It was apparently expected that the gratuity fund would rapidly increase and so it did for the first few years, and at the end of the seventh year exceeded a million of dollars. But

the death rate, which was only thirty-one during the first year, gradually increased until the year 1896 when the number had reached sixty-seven and the gratuity fund had been reduced to about $700,000.

As early as 1887 it had become apparent that the death rate had been underestimated and equally apparent that the plan of insurance adopted was not founded on sound insurance principles. An attempt was made by amendment to the by-laws to improve the situation and a by-law was passed providing in effect that as to all members thereafter admitted time and amount of gratuity payments should be computed from the date of admission to membership and not from the adoption of by-law number 57, thereby detaching the gratuity right from the certificate of membership upon its transfer on the books and compelling the transferee to begin at a $2,000 gratuity rating instead of the maximum $10,000 rating. The amendment also provided that the gratuitants of members thereafter admitted over fifty years of age should not receive more than the amount of the assessment made therefor.

In 1889 the by-laws were further amended so as to provide that gratuitants of members joining after February first, 1890, should not receive over $9,000 or its proportionate amount.

In 1896, the gratuity fund having fallen to $700,000, further amendments of the by-laws were made repealing the provision that after the exchange should be free from debt the surplus revenues should be paid into the gratuity fund, and providing that one-half of the surplus revenues should thereafter be paid yearly into said fund, although the exchange was then in debt over one million, and further repealing the provision limiting the assessment to $150 for each death whenever the fund should be less than one million.

A few months later another amendment to the by-laws was adopted reducing the limitation of the fund, which had been placed at $1,000,000 to $750,000, and further providing that all the surplus revenue of the exchange should be paid into the gratuity fund for a period of five years.

The practical operation of these amendments up to 1899

was to benefit the fund over $930,000 by a reduction of the gratuities to members, realization from assessments in excess of fifty each year, and a payment into the fund from the surplus income of the exchange, which amount was in excess by about $180,000 of the accumulated fund on hand.

As the five years during which the surplus income of the exchange was to be paid into the fund was about expiring and sixty-one certificates had been sold under by-law 21 for non-payment of assessments, resulting in a deficiency of over $5,000, and as there were eighty-four empty seats and, therefore, that number of surplus certificates and the market price of the certificates had fallen below the amount necessary to secure the payment of the assessments, a public meeting of the members was called to consider what action should be taken which resulted in the appointment of a committee to consider the subject and report. The committee subsequently reported in favor of a substantial change in the by-laws which was duly approved by the board of managers, and subsequently and on January 22d, 1900, ratified by a majority of the members.

In substance the amendments provided (1) that the number of assessments for gratuity purposes should be limited to fifty in each year; (2) that the amount of the assessment upon members thereafter admitted over forty years of age should be increased upon a graduated scale depending upon age at the time of admission; (3) that the total amount realized from such assessments during any one year after deducting the expenses of administration should be divided among the beneficiaries of the subscribing members dying in such year in such proportions as to preserve the relative rights as they theretofore existed; (4) that each transferee of a certificate upon admission to membership should succeed to the gratuity rights of the transferer; (5) that the provision for the payment of the surplus income of the exchange into the gratuity fund be repealed; (6) that the board of managers be authorized to purchase and retire membership certificates, using for that purpose the surplus income of the exchange, and not

the gratuity fund; (7) that the trustees of the gratuity fund should convert the accumulated fund into cash and after paying therefrom all expenses, including those caused by this modification of the gratuity system, should distribute the same among the subscribing members as the class might be constituted on February 1, 1900, in accordance with their just and equitable rights.

Thereafter the plaintiffs Woolsey and Consider Parish, who were members of the exchange long before 1882, when the gratuity system was adopted, and who subscribed thereto in the manner provided by the exchange and within sixty days after the adoption of the by-law, brought this action for the purpose of obtaining a judgment declaring the amendments to the by-laws adopted January 22, 1900, void.

Judgment to that effect was entered upon report of a referee, which was subsequently affirmed by the Appellate Division.

The plaintiffs contend that their rights in the gratuity system and their obligations in reference thereto exist entirely by force of a contract made by each of them with the other subscribing members to the system and that such contract is inviolate and cannot be altered or changed in any material respect or provision except with the consent of all contracting parties, and hence that it is not subject to alteration or change by vote of a majority of the members of the exchange. In the members' subscription signed by each member, and which was prepared in pursuance of the by-laws, it is recited that the undersigned member agrees "with the said exchange and with the other subscribing members that upon the death of each and every subscribing and future member of said exchange I will pay the assessment as provided in the by-laws," and from this it is argued that the gratuity system was created by contract between the parties and the exchange and exists by reason of that contract only and not by force of any statute or any by-law of the corporation. But it will be noted that the by-laws are referred to in terms in the member's subscription as the source of the assessment to be paid, and, further, it is

provided therein that the moneys are to be paid to the family of a deceased member as provided in the charter and by-laws of said exchange. The foundation of the contract therefore is to be found in the amendment of 1882 to the charter, which added to its purposes as set forth in the charter that of making "provision for the widows and families of deceased members." The amended charter expressly provides that this corporate purpose shall be carried out by the by-laws. It says of the assessment that it must be such "as shall be provided in the by-laws of said corporation;" the payment to be made to the beneficiaries shall be "such proportion thereof as the by-laws may provide;" the by-laws may determine how much of the surplus income of the exchange may be used for such purpose and that the payments may be made "in such manner as the by-laws shall prescribe." It was by virtue of the power thus granted that section 57 of the by-laws was enacted by the exchange.

It is at least doubtful whether the legislature had power by charter amendment to impose on the then membership of the exchange a corporate purpose so foreign to the purposes expressed in its original charter without the consent of every member of the exchange, and hence it became necessary to provide therein that the by-laws which should be made thereunder should be operative only on such of the then existing members of the exchange as should "agree" and "consent," and the effect of an existing member's agreement or consent was to put such member in the precise situation in relation to the charter amendment and the by-laws enacted in pursuance thereof as the members of the exchange who were admitted after the charter amendment and the adoption of the fifty-seventh by-law. Certainly, as to the latter, there is not room for the contention that the system is not an incident of membership.

If it be true, then, as we think it is, that the gratuity system does not rest alone in contract made by each member with every other member of the Produce Exchange, but rather that a member's rights are to be found in and determined by

the contract between him and the Produce Exchange as interpreted by its charter and by-laws under which it was made, it follows that the right exists in the latter to amend the by-laws by "reasonable amendment" as that term is used in the authorities. There is no hard and fast rule by which courts may at all times readily separate the valid from the void amendments, because amendments are occasionally designedly close to the border line between legality and illegality, the intention of the framers frequently being to go as far in the direction of illegality as possible and still save the amendment from condemnation, with the result oftentimes that the line is overstepped because the mind undertaking the task of mastering the problem, instead of approaching it from the judicial standpoint, attempts to find out all the danger-sign posts that have been erected by decision, and then avoid their locality as well as places apparently analogous.

Courts have widely differed in the several jurisdictions in this country as to the extent to which contracts with members may be affected by amendments to the by-laws of a corporation. In some jurisdictions amendments to by-laws have been sustained which operated to take away benefits entirely, and in a very recent case in Massachusetts an amendment reducing sick benefits, which was adopted after the plaintiff had become entitled to such benefits, was upheld, the court saying in the course of the opinion: "We are aware that the doctrine herein enunciated is inconsistent with some decisions in other states, but we are satisfied that it is sustained by the better reasoning and the weight of authority." (*Pain* v. *Société St. Jean Baptiste*, 172 Mass. 319.)

The trend of authority in this state is, however, in the other direction, and first found expression in this court in the well-known case of *Kent* v. *Quicksilver Mining Co.* (78 N. Y. 159). In that case the corporation was created by special act of the legislature, and the act provided, among other things relating to the by-laws, that the company should have power "to alter, amend, add to or repeal at their pleasure, provided that such by-laws shall not be contrary to the Consti-

tion of this state, or the provisions of this act, * * * and to issue certificates of stock representing the value of their property in such form and subject to such regulations as they may, from time to time, by their by-laws prescribe." The by-laws enacted pursuant to the authority thus conferred directed the capital stock to be divided into equal shares and issued, all of which was done. But subsequently, by vote of the stockholders holding a majority of the capital stock, the by-laws were so amended as to authorize the issuing of an equal number of shares of preferred stock for common stock returned to the company with a cash payment of $5 on each share, all preferred stock to be entitled to interest at 7% per annum, to be paid out of the net profits of the company, the surplus earnings after such payment to be divided *pro rata* among the holders of the preferred and common stock. A large number subscribed and paid the sum prescribed, which went into the assets of the company. Some four years later a holder of common stock brought an action to restrain payments to preferred stockholders from the profits of the company, and when the action came before this court the opinion conceded that under its charter the corporation might have provided in the first instance by its by-laws for a division of its shares into common and preferred, but that instead it duly made a by-law dividing its capital stock into equal shares, and directing the issue of certificates of stock therefor. To the contention made that the charter expressly conferred the power to alter, amend and repeal the by-laws, and, hence, that the subsequent amendment was authorized and the action taken thereunder binding, the court made answer: "There is a power in this charter to alter, amend, add to or repeal, at pleasure, by-laws before made. It is argued from this that it was in the power of the corporate body, in due form and manner, to alter the by-law which had fixed the amount of the capital stock and the number and relative value of the shares thereof. The power to make by-laws is to make such as are not inconsistent with the Constitution and the law; and the power to alter has the same

limit, so that no alteration could be made which would infringe a right already given and secured by the contract of the corporation. Nor was the power to alter, to the extent of affecting the contracted relative value of a share, reserved when the share was sold to the stockholder, so as to enter into and form a part of the contract. An alteration is a *pro tanto* repeal; but no private corporation can repeal a by-law so as to impair rights which have been given and become vested by virtue of the by-law afterwards repealed. All by-laws must be reasonable and consistent with the general principles of the laws of the land, which are to be determined by the courts, when a case is properly before them. (*The Master, etc.,* v. *Green,* 1 Ld. Raym. 113.) A by-law may regulate or modify the constitution of a corporation, but cannot alter it. (*Rex* v. *Cutbush,* 4 Burr. 2204; *R. W. Co.* v. *Allerton,* 18 Wall. 233.) The alteration of a by-law is but the making of another upon the same matter. If the first must be reasonable and in accord with the principles of law so must that which alters it. If then the power is reserved to alter, amend or repeal, and that reservation enters into a contract, the power reserved is to pass reasonable by-laws, agreeable to law. But a by-law that will disturb a vested right is not such. (See *Gray* v. *Portland Bank,* 3 Mass. 364; Grant on Corps. 91.) And it differs not when the power to make and alter by-laws is expressly given to a majority of the stockholders and that the obnoxious ordinance is passed in due form."

Later *Weiler* v. *Equitable Aid Union* (92 Hun, 277) came before the General Term and it presented a case of an amendment to the by-laws which operated to change a definite and absolute contract to pay in case the plaintiff was alive and in good standing at the end of eleven years into a contract to pay only in case the plaintiff was totally disabled physically, and then only one-tenth thereof annually. The court held that the amended by-law was an unreasonable by-law and, therefore, void, and in the course of its opinion said: " A power reserved to make by-laws means a power to make reasonable by-laws. This principle applies to associations like the

defendant. What by-laws are to be deemed reasonable depends on the objects and purposes of the society. * * * Here the object and purpose of the corporation, as appears from the findings of fact above quoted, was among other things to do a life insurance business upon the assessment plan and give certificates payable in manner and form as that given to plaintiff. The by-law in question strikes down these certificates, and to that extent changes the objects and purposes of the corporation. The right of plaintiff to payment upon the contingency named in the certificate was in the nature of a vested right. The plaintiff had the right to believe that the defendant would not by the adoption of a new by-law assume to change as to him the objects and purposes of the corporation, upon the basis of which he had made his contract and for ten years and upwards had performed upon his part. As to the plaintiff the new by-law was simply a repudiation of a positive contract."

The Appellate Division, first department, in *Farmers' Loan and Trust Co.* v. *Aberle* (19 App. Div. 79) had before it a controversy as to the disposition of a fund created under by-laws made a part of an insurance company's contract with the policyholders, the claim being that the association had so amended its by-laws as to authorize the directors to use the fund differently than as originally provided. In disposing of this controversy a unanimous court, Justice RUMSEY writing, said : "It must be deemed now to be established that, even though the right is reserved to the association to amend and change its by-laws, and although the by-laws are said to form part of the contract between the association and its members, yet there is no power in the association so to amend its by-laws as to divest rights which have vested, however broad may be its power as to mere ˄matters of administration. (Citing cases.) Within the rules laid down by these cases it must be held that no amendment to the by-laws of an association of this character can be made operative to divest rights which have already vested in the members."

In *Engelhardt* v. *Fifth Ward P. D. S. & Loan Assn.* (148
4

N. Y. 281) the by-laws of a mutual loan association, organized pursuant to the statute, provided that dues paid in "will be refunded" to withdrawing members "when the necessary funds are collected." The plaintiff, a withdrawing member, brought an action to recover the dues paid by him, and on the trial was confronted by an amendment to the by-laws providing that withdrawing members should be paid in the order of presentation of their applications, and, further, with the fact that some seventy-eight members had filed their applications for withdrawal previous to the one filed by him, and that their payment had exhausted for the time being the moneys in the treasury of the association available for that purpose. The court held that while under the power to make reasonable by-laws a mutual loan association cannot destroy a contract, created between it and its members by the articles of association, to refund his dues to a withdrawing member, it may enact a by-law more or less affecting the remedy of a member, and existing members will be bound thereby, so far at least as they consent to the exercise of such power when they become members, and the amendment was held to be a reasonable regulation. Chief Judge ANDREWS, in speaking of the power of the corporation to change its by-laws, said, among other things: "The member of an association accepts membership with notice of the powers thus conferred. He is subject not only to regulations existing when he becomes a member, but to such as may be enacted from time to time by the association within the scope of the power given by statute. It may be admitted that the association could not under this power destroy the contract between it and the member. But the contract made was in law subject to the power of the association to enact at any time reasonable by-laws. It would not be reasonable to extend this power so as to authorize the association by a subsequent by-law to change the essential character of an antecedent agreement between a member and the association, as for example, that a withdrawing member should not be repaid his dues."

These cases, as we understand them, establish a principle

which we deem well supported in reason, that the power of a
corporation such as this one to amend its by-laws is a power to
regulate within reasonable bounds, not a power to destroy the
contract rights of its members.   Now, as we have already
seen, the amended by-law, among other changes, provided
that the number of assessments in any one year should not
exceed fifty no matter how many deaths there should be    It
repealed the clause requiring payment of the surplus income
of the exchange into the gratuity fund and authorized the board
of managers to use the surplus income in purchasing and retir-
ing membership certificates, and directed the trustees of the
gratuity fund to convert the present accumulated fund, amount-
ing to about three-quarters of a million of dollars, into cash and
to distribute the sum among the subscribing members, "as
the class may be constituted on February 1st, 1900, in accord-
ance with their just and equitable rights." The Appellate
Division expressed the opinion that these several amendments
evidenced a scheme which had for its ultimate object an aban-
donment of the gratuity system, in which one of the plaintiffs
had already invested $2,500, and much of argument might be
adduced in support of this view, but whether such was the
purpose or not it is apparent that a long stride in that direc-
tion was taken by several features of the amendments, and
especially by the last one referred to which undertook to dis-
tribute among the subscribing members a fund of three-
quarters of a million of dollars which had been created in
pursuance of the authority conferred by its charter " to make
provision for the widows and families of deceased members."
It was for this purpose that the power was given to provide a
fund by assessments upon such of the then members of the
corporation as should agree thereto and all persons who should
thereafter join the corporation as is evidenced by the further
provision of the statute that the fund to be created by assess-
ment, together with such proportion of the surplus income of
the corporation as the by-laws should provide " may be paid
to the widow, children, next of kin of, or other persons
dependent upon said deceased member in such manner as the

said by-laws shall prescribe." The by-laws provided the working plans for this scheme, while the contract of the subscribing members with the association was made under the charter and these by-laws which expressed no other or different disposition for the fund to be accumulated in the manner provided therein than that it should be paid to the " widow, children, next of kin of, or other persons dependent upon said deceased member." For that purpose it was paid over to the trustees of the gratuity fund, and with that object in view they accepted it, and every dollar thus contributed and paid over for that purpose was impressed with that trust, and the trustees held it thus impressed. A by-law attempting to devote the fund to an entirely different use, which seeks to take it from the beneficiaries of the deceased members and give it to the living subscribing members, is without authority and void not only because it destroys the rights of the members secured to them by the by-laws upon which they relied, and had a right to rely, when they contracted with the association and paid assessments under that contract, but also for the reason that the statute did not confer upon the members of the exchange the power to create a fund by assessment for distributing among the subscribing members thereof. Had such a by-law been enacted in the first instance it would have been without authority in the charter, which did not attempt to confer the power to create a gratuity fund for distribution among the members of the exchange, but instead limited its scope to that of provision for the widows and families of deceased members or other persons dependent upon a deceased member. It follows that this feature of the amended by-laws was unreasonable, as that term is employed in the decisions, and the amendment is void.

Now, it is true that the provision we have specially considered constitutes but one of several features of the amendment submitted to the members for their action, but it cannot be said that without it any of the other features would have been adopted. The amendment was adopted by a very small margin of votes, and it may well be that the expectation

of an immediate division of a fund of three-quarters of a million of dollars contributed more than the other provisions of the amendment to gain the few votes which the majority had over the minority. It follows that as the feature of the amendment we have specially considered is void the amendment must fall in its entirety, and it becomes unnecessary to consider the other features.

The judgment should be affirmed, with costs.

GRAY, O'BRIEN, HAIGHT, LANDON and WERNER, JJ., concur; CULLEN, J., not sitting.

Judgment affirmed. _____